AMERICANS UNITED FOR SEPARA-
TION OF CHURCH AND STATE
et al., Plaintiffs,

v.

John W. PORTER et al., Defendants.

No. G 287–72–CA 7.

United States District Court,
W. D. Michigan, S. D.

Feb. 20, 1980.

Stuart Hubbell, Traverse City, Mich., Emory A. Dakoske, co-counsel, Hubbell, Houlihan & Elhart, Traverse City, Mich., for Grand Traverse Catholic Schools.

Patrick J. Wilson, Running, Wise & Wilson, Traverse City, Mich., for Traverse City Schools.

William B. Ball, Ball & Skelly, Harrisburg, Pa., for intervenor-defendants.

Frank J. Kelley, Atty. Gen., Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for Supt. John W. Porter.

Albert R. Dilley, Grand Rapids, Mich., for plaintiffs.

OPINION

ENGEL, Circuit Judge, sitting by designation.

In this litigation the court measures the dual enrollment program instituted by the Traverse City Public Schools against the limitations of the Establishment Clause of the First Amendment to the United States Constitution.[1]

1. During the course of trial, counsel for the plaintiffs claimed that children whose parents are not residents of the Traverse City Public School District, but attend its public schools are required to pay tuition; however, children enrolled primarily in St. Francis, whose parents are non-residents, and attend public school classes either at the Annex or elsewhere in the public school system do not pay tuition. It does appear that under 1979 P.A. 94, sec. 111(3), M.C.L.A. § 388.1711(3) (1979), certain additional payments of state aid are made to

As the American political and economic society becomes more complex, so does the task of educating the young. New programs, policies and regulations intended to aid the students also drastically increase the cost of education. The operation of private schools provides an undeniable benefit to the general public. These schools educate a large number of our young people without public support, while the families whose children attend these schools continue to support the operation of the public schools. Private schools also greatly benefit the public by providing choice through diversity in education, and by serving as competitive institutional models for the public schools. The substantiality of these benefits has long been recognized and urged as the justification for various forms of public assistance to private schools. In his separate opinion in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), Mr. Justice Brennan noted that this argument had been advanced in the Illinois courts in 1888:

> The recurrent argument, consistently rejected in the past, has been that government grants to sectarian schools ought not to be viewed as impermissible subsidies "because [the schools] relieve the state of a burden, which it would otherwise be itself required to bear . . . they will render a service to the state by performing for it its duty of educating the children of the people." *Cook County v. Chicago Industrial School*, 125 Ill. 540, 571, 18 N.E. 183, 197 (1888).

*Id.* at 654, 91 S.Ct. at 2131.

■ The benefits conferred on the public by private sectarian schools cannot be denied, but public aid to those schools is sharply circumscribed by the absolute terms of the First Amendment. Each attempt to aid a sectarian enterprise must be carefully scrutinized to determine whether it constitutes a "law respecting an establishment of religion." Although the effect of the First Amendment may often seem harsh, it has served to preserve American's cherished freedom to worship according to one's choice, without coercion or government sanction, for nearly 190 years.

## I. FACTS

Most of the relevant facts concerning the Traverse City dual enrollment program are undisputed. While the court has carefully considered the entire record, the salient facts can be stated very briefly here. More detailed facts will be developed in the latter portions of the opinion to which they are relevant.

Shared time instructional programs, which provide non-public school students with the opportunity to take public school classes on a part-time basis, have been a part of Michigan's educational system for over 50 years.[2] Following a 1970 amendment to the Michigan Constitution which was intended to bar implementation of parochiaid legislation, the Michigan Supreme Court was asked to render an advisory opinion on the constitutionality of shared time programs in Michigan. *Traverse City School District v. Attorney General*, 384 Mich. 390, 185 N.W.2d 9 (1971). The court ruled that it is permissible under the Michigan Constitution to offer public school classes to non-public school students on premises leased from non-public schools.[3]

It is against this backdrop that the dual enrollment program at St. Francis High

---

the Traverse City School District for the ten to twenty non-resident students who are enrolled in St. Francis but who attend the Traverse City public schools as part-time school students. . Other than the uncorroborated testimony of one or two witnesses, the precise effect of the statutory scheme remains uncertain. The plaintiffs did not raise this issue in the complaint and it was not adequately explored during the course of trial. Thus, the court expressly declines to pass judgment upon this practice, if indeed it exists.

**2.** Shared time classes were held in Houghton, Michigan as early as 1921, and they appear to have been available in various parts of the state ever since that time. *Traverse City School District v. Attorney General*, 384 Mich. 390, 407 n. 2, 185 N.W.2d 9, 15 n. 2 (1971).

**3.** Id. at 415, 185 N.W.2d at 19–20.

School was established. In December, 1970, the Board of Education of the Grand Traverse Area Catholic Schools voted to close grades 7 and 8 of Immaculate Conception Middle School and grades 9 through 12 of St. Francis High School at the close of the 1970–71 school year. As a result of this decision, the Traverse City Public School District was faced with the responsibility to provide an education for over 600 parochial school students who would be newly entering the public school system. The problems occasioned by such a sudden influx of new students are readily apparent. Shortages of classroom space, teachers and equipment all contributed to make the imminent closing of these Catholic schools a serious problem for public school administrators.

Following the Michigan Supreme Court's decision in *Traverse City School District v. Attorney General*, the Traverse City Public School District agreed to lease a portion of the Immaculate Conception Middle School building and a portion of the St. Francis High School building for use as public school classrooms commencing with the September, 1971 fall term. Included in the lease were provisions for a $200 yearly rental fee, removal of all religious objects from the leased premises, and the posting of 10″ × 18″ signs designating the premises as a public school. The rental fee was subsequently modified so that only the nominal amount of $1 per year is presently paid for the use of the premises. The leasing plan was reviewed and approved by the Office of the Attorney General and by the Michigan Department of Education. Since then both parties have scrupulously adhered to the terms of the lease.

Although the public school classes conducted on the premises leased in the Immaculate Conception Middle School were discontinued at the end of the 1973–1974 school year, the leased portion of the second floor of the St. Francis School building, designated as the public school "Annex," continues to be used for public school classes. In addition, the public school district receives state aid payments for the 457 part-time public school students currently attending classes at the Annex.[4]

St. Francis High School has continued to operate as a parochial school, but it does not offer a complete high school program. Its students must take some classes through the public schools to graduate. Although approximately 98 St. Francis students are enrolled in classes at Traverse City's principal high school facility, the Milliken Street campus, it is possible and not unusual for a student to graduate from high school by taking only those courses offered at St. Francis and at the Annex in the St. Francis building.

Since its inception, the Annex has maintained a teaching staff of 8 to 12 public school teachers, who have taught a variety of courses, including French, Algebra, Geometry, Physiology, Biology, Accounting, American Government, World Cultures, Typing and various Business Education classes. Although the proofs do not show the number of teachers currently employed by St. Francis High School, the school announced at the beginning of the program that it would maintain a staff of nine teachers. St. Francis High School has continued to offer courses in Religion, English, Chemistry, Earth Sciences, Pre-Algebra, Advanced Algebra, Senior Math, Consumer's Math, Teacher Aide and Librarian Aide, Physical Education, Choral, and Instrumental Music. There is no duplication of course offerings between St. Francis High School

4. A rough indication of what Michigan state law considers to be the public's percentage of contribution to the overall education of non-public school students is found in its system for converting the actual number of part-time parochial students into the equivalent number of full-time public school students for the purpose of state aid. Thus, at trial Dr. Vernon Oxender, Superintendent of the Traverse City Public Schools, testified that presently there are 475 shared-time students from St. Francis attending classes in the Annex. Under the state full-time equivalency formula, the 475 students were determined to be equivalent to 196 students in the public school system. Therefore, it can be seen even by this rough approximation that the amount of state participation in the education of parochial school students enrolled in the shared-time program is substantial.

and the Annex. Although the Annex is theoretically open to all public school students, Annex classes (with the exception of driver's education) are attended solely by students who are primarily enrolled in St. Francis High School.

## II. THE CONSTITUTIONAL STANDARD

█ The First Amendment states that "Congress shall make no law respecting an establishment of religion . . . ." This prohibition is applied to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court described the scope of this clause as follows:

The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be "no law *respecting* an establishment of religion." A law may be one "respecting" the forbidden objective while falling short of its total realization. A law "respecting" the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.

In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission*, 397 U.S. 664, 668 [90 S.Ct. 1409, 1411, 25 L.Ed.2d 697] (1970).

In *Lemon* the Court distilled from its previous decisions a three-prong test, which addresses these "three main evils" against which the Establishment Clause was intended to protect:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen*, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion." *Walz [v. Tax Commission*, 397 U.S. 664, 674 [90 S.Ct. 1409, 1414, 25 L.Ed.2d 697] (1970)].

As the Supreme Court has recognized, this test is far easier to enunciate than it is to apply. *See, e. g., Tilton v. Richardson*, 403 U.S. 672, 677–78, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971).

Plaintiffs here do not challenge the constitutionality of a particular state statute but rather the particular program operated by the Traverse City School District. For their part the defendants acknowledge that the program is subject to the proscriptions of the Establishment Clause and claim the program fully meets the three-pronged criteria of *Lemon*.

## III. SECULAR PURPOSE

█ It is apparent to the court that, initially at least, the dual enrollment program met the "secular purpose" requirement of *Lemon*. The validity of a public school system's concern for its students' freedom to choose the type of school desired, and the school's need to avoid overcrowding in the schools, often while working within strict budgetary limitations, were recognized by the Supreme Court in *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Mr. Justice Powell wrote:

We do not question the propriety, and fully secular content, of New York's interest in preserving a healthy and safe educational environment for all of its school children. And we do not doubt—indeed, we fully recognize—the validity

of the State's interests in promoting pluralism and diversity among its public and nonpublic schools. Nor do we hesitate to acknowledge the reality of its concern for an already overburdened public school system that might suffer in the event that a significant percentage of children presently attending nonpublic schools should abandon those schools in favor of the public schools.

413 U.S. at 773, 93 S.Ct. at 2966. The imminent closing of St. Francis and Immaculate Conception presented a serious threat of overcrowding in the public schools. The court, therefore, finds that at least in its creation, the dual enrollment program was motivated by a valid secular purpose.

## IV. PRIMARY EFFECT

■ The second prong of the *Lemon* test is that the "principal or primary effect" of a program must be one that "neither advances nor inhibits religion." 403 U.S. at 612, 91 S.Ct. at 2111. The inquiry here focuses upon the benefits conferred by a statute or program. Incidental benefits to a religious endeavor do not render a program unconstitutional. *See, e. g., Committee for Public Education v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). At the same time even a very significant benefit to the state will not save a program which still has a "primary effect" of advancing religion. *Id.* at 783, 93 S.Ct. at 2970.

In *Nyquist, supra,* the Court amplified the meaning of the "primary effect" standard:

Appellees, focusing on the term "principal or primary effect" which this Court has utilized in expressing the second prong of the three-part test, *e. g., Lemon v. Kurtzman, supra,* [403 U.S.] at 612 [91 S.Ct., at 2111], have argued that the Court must decide in these cases whether the "primary" effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. Mr. Justice White's dissenting opinion, *post,* [413 U.S.] at 823, [93 S.Ct., at 2998,] similarly suggests that the

Court today fails to make this "ultimate judgment." We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a "primary" effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. . . . Any remaining question about the contours of the "effect" criterion were resolved by the Court's decision in *Tilton,* in which the plurality found that the mere possibility that a federally financed structure might be used for religious purposes 20 years hence was constitutionally unacceptable because the grant might "*in part* have the effect of advancing religion." 403 U.S., at 683 [91 S.Ct., at 2098] (emphasis supplied).

. . . [S]ecular objectives, no matter how desirable and irrespective of whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify . . . a direct and substantial advancement of religion.

413 U.S. at 783–85, n. 39, 93 S.Ct. at 2971.

Thus, *Nyquist* makes it clear that there may be more than one "primary effect," and that a "direct and immediate" or "direct and substantial" effect of advancing religion is sufficient in itself to trigger First Amendment protections despite any concurrent benefits to the state. More recent guidance in this area was supplied by the plurality opinion in *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976):

The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity. The State may not, for example, pay for what is actually a religious education, even though it purports to be paying for a secular one, and even though it makes its aid available to secular and religious institutions alike. The Court also has

taken the view that the State's efforts to perform a secular task, and at the same time avoid aiding in the performance of a religious one, may not lead it into such an intimate relationship with religious authority that it appears either to be sponsoring or to be excessively interfering with that authority.

■ Measured against the language of *Lemon, Nyquist* and *Roemer*, the conclusion is inescapable that the existence of the public school Annex in the leased portion of the St. Francis school building significantly benefits the St. Francis School. The school has been able to remain open and operating while offering only a partial high school curriculum. At the same time, the St. Francis students have been able to receive a high school education completely within the walls of the St. Francis building, without ever coming into contact with students who are not enrolled in St. Francis.[5] Due to this complete student homogeneity, St. Francis has remained intact as an entity separate from the public schools, but with a curriculum largely supported by the public schools. It does not appear that the parochial school authorities considered operating a part-time school when they were faced with the prospect of closing the doors of St. Francis High School. The difficulties of implementing and operating such a program are obvious. The courses which the Annex provides alleviate these problems, however, and enable a part-time school to provide a full-time education for its students. Although St. Francis authorities may have lost their direct control over a portion of their students' education, they have retained, intact, a fully identifiable parochial high school, offering a full high school curriculum in one building, while supporting only a portion of that curriculum. In short the Annex program has provided the greatest benefit which the state could bestow upon a sectarian school: the financial ability to continue its educative religious functions without bearing all of the otherwise prohibitive costs of doing so.

The sensitivity of the public authorities to the needs of the parochial school is illustrated by the Immaculate Conception School dual enrollment program. When the parochial school regained its ability to conduct all of the classes for Immaculate Conception students by itself, the public school withdrew the dual enrollment program. Thus the dual enrollment program has both the appearance and effect of subsidizing the parochial school to the extent necessary to allow it to continue operating at its fullest capability.

In the opinion of the court the necessarily close cooperation between the two systems, which allows the students to enjoy a full educational program at St. Francis, though sensible, fatally flaws the dual enrollment program at the Annex. The Court in *Meek v. Pittenger*, 421 U.S. 349, 365–66, 95 S.Ct. 1753, 1763–1764, 44 L.Ed.2d 217 (1975), made it very clear that aid to the educational function of religious schools must be considered an advancement of religion, writing:

> Even though earmarked for secular purposes, "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission," state aid has the impermissible primary effect of advancing religion. *Hunt v. McNair*, 413 U.S. 734, 743 [93 S.Ct. 2868, 2874, 37 L.Ed.2d 923].
>
> . . . The very purpose of many of those [church related] schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon v. Kurtzman*, 403 U.S., at 616–617 [91 S.Ct., at 2113]. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole.

The institution of the Annex program has clearly provided "substantial aid" to the

---

5. Some non-St. Francis students have enrolled in the driver's education course taught at St. Francis, but this is the only course offered at the Annex which has been attended by students who are not enrolled in the St. Francis parochial high school.

educational function of the parochial school, as it has enabled the school to retain its very ability to educate. This program must therefore be viewed as having the primary effect of advancing religion.

The court observes that the aid to the parochial school here is quite different from that allowed by the Supreme Court in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). In *Wolman*, the Court held that publicly funded remedial, therapeutic, and guidance services which were provided to non-public school students in facilities used to service only those non-public school students were acceptable under the First Amendment. These publicly funded services did not directly provide aid to the educational function of the non-public schools. Moreover, *Wolman* took pains to distinguish those cases where public school services are provided on sites identified with the functions of the non-public schools:

> At the outset, we note that in its present posture the case does not properly present any issue concerning the use of a public facility as an adjunct of a sectarian educational enterprise. The District Court construed the statute, as do we, to authorize services only on sites that are "neither physically nor educationally identified with the functions of the non-public school." 417 F.Supp. [1113], at 1123. Thus, the services are to be offered under circumstances that reflect their religious neutrality.
>
> \* \* \* \* \* \*
>
> The fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in *Meek*. The influence on a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution. The dangers perceived in *Meek* arose from the nature of the institution, not from the nature of the pupils.

> Accordingly, we hold that providing therapeutic and remedial services at a neutral site off the premises of the non-public schools will not have the impermissible effect of advancing religion.

433 U.S. at 246–48, 97 S.Ct. at 2605 (footnote omitted).

Although the Annex is marked and conducted as a public school, the 10″ × 18″ placards do not prevent the premises from being "physically [or] educationally identified with the functions of the non-public school," particularly where, as here, there is no difference in student population between the public school and parochial school sections of the building. In these circumstances, the removal of religious objects and the posting of signs is not sufficient to transform the leased classrooms into a religiously neutral location.[6]

## V. EXCESSIVE ENTANGLEMENT

In the opinion of the court, the dual enrollment program fails altogether to meet the third test of *Lemon*, which proscribes excessive entanglement between the public schools and the church. In the court's view the test is whether the program presents a potential for excessive entanglement, not whether the potential dangers have been successfully met and resolved with good faith neutrality. In all events the court finds that even the most conscientious efforts of the two school systems have not been sufficient. The program is excessively entangling in fact, and to a marked degree.

In *Lemon v. Kurtzman, supra*, 403 U.S at 602, 91 S.Ct. at 2105, the Supreme Court ruled that Rhode Island's Salary Supplement Act, which authorized salary supplements for non-public school teachers who taught only those courses offered in the public schools, violated the First Amendment. The Court assumed that every reasonable effort would be made to avoid the danger that the teachers so subsidized would inculcate religion into their teaching.

---

**6.** On the weekend following trial the court was in Traverse City and, with the consent of the parties, drove around the perimeter of the St. Francis school block. The view merely confirmed the physical layout as more clearly shown by the photographs in evidence.

However, the very efforts which would be required to avoid First Amendment transgressions and to monitor compliance with the Act represented a quantum of entanglement between church and state which violated the First Amendment. The Court wrote:

> The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion—indeed the State here has undertaken to do so. To ensure that no trespass occurs, the State has therefore carefully conditioned its aid with pervasive restrictions. . . .
>
> A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.

403 U.S. at 619, 91 S.Ct. at 2114.

In *Meek v. Pittenger, supra,* the Supreme Court ruled that a statute authorizing the provision of state funded teachers for remedial and exceptional students in the nonpublic schools presented too great a potentiality for excessive entanglement between school and church. There Mr. Justice Stewart observed:

> The fact that the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work, does not substantially eliminate the need for continuing surveillance. To be sure, auxiliary-services personnel, because not employed by the nonpublic schools, are not directly subject to the discipline of a religious authority. *Cf. Lemon v. Kurtzman,* 403 U.S., at 618 [91 S.Ct., at 2113]. But they are performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained.

421 U.S. at 371, 95 S.Ct. at 1766. Five years earlier, in *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Supreme Court had posed the excessive entanglement question as one requiring a determination of "whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance . . . . ." *Id.* at 675, 90 S.Ct. at 1414.

As careful as the Traverse City School District and the St. Francis school authorities have been to avoid entanglement, it is overwhelmingly evident to the court that the potential for excessive entanglement exists in the present system. This problem has been explicitly recognized by public school administrators. In a 1972 report entitled "A Review of the Dual Enrollment Program," public school administrators actually listed some of the troublesome features of the program and what steps had been undertaken to avoid entanglement.[7]

---

7. That report stated in part:

1. Caution has been exercised to avoid the label "excessive entanglement" in the relationships between public and parochial. Following are gray-area situations encountered and the solutions arrived at:

a) Upon occasion it has been necessary for Waldo Keating [then assistant principal in charge of the Annex and coach for St. Francis football team] to be absent from his administrative duties because of his coaching responsibilities.

In each case he has followed proper procedure in making application for a vacation day (or ½ day) and his application has been approved. No reason for absence need be stated on a vacation request.

At the year's end he will have properly fulfilled the terms of his contract in accordance with Board policy and procedure.

b) Time schedules of classes at the public schools and at St. Francis deviate to some extent, but not significantly. (Five minute difference in class length at Senior High and a two minute difference at Junior High). The deviation is necessary to allow for during-the-day transportation between Senior High and St. Francis, but is not considered excessive. State requirements with respect to hours of instruction per year have been met.

Thus, even the public school authorities recognize the potential for excessive entanglement and the need to guard against it. The monitoring required for this program is not merely the normal oversight of public school activities by public officials. Because of the complete identity of the student bodies and the physical arrangement of the classrooms, the activities of St. Francis, its religious services, athletic events, pep rallies, and special programs all directly affect the operation of the Annex. The public school authorities must monitor not only the activities of the Annex but also those of St. Francis. The circumstances of this program also require surveillance of the content of the courses taught at the Annex. Because of the pervasive religious atmosphere of the school as a whole, and the student body comprised of only those students enrolled in a single sectarian school, the possibility for infusing religion into the classroom activity is much greater than it would be at a typical public school.

The thrust of *Lemon v. Kurtzman, Meek v. Pittenger* and *Walz v. Tax Commission* is that where the public and private school spheres are so close that continued monitoring of the fine line between them is mandated, that monitoring is itself an indicator of excessive entanglement. The court finds these cases to be controlling here.

The potential for excessive entanglement evident on the face of this program is the primary basis for holding it constitutionally impermissible. However, the dual enrollment program has been excessively entangling in actual operation, and even the most conscientious efforts of both systems have not been sufficient to overcome its fundamental deficiencies. Some areas of impermissible entanglement as shown by the record are examined below.

### A. Establishment of the Annex Curriculum

The witnesses at the trial took great care to emphasize that the decision to close St. Francis High School was solely that of the parochial authorities, and that the decision to offer shared time services was solely that of the public school authorities. The court credits this testimony. However, the inference that these two bodies, each having such a vital interest in the welfare of the children involved, somehow operated like ships passing in the night, must be viewed with considerable skepticism.

It is impossible to believe that detailed and lengthy discussions were not required to arrive at the program which was ultimately adopted. The various details of the lease had to be worked out. The public school authorities had to know what kind of curriculum the parochial schools could afford to offer. In the alternative, the parochial schools had to know what type of shared time public education program the public schools were willing to offer. Both

c) All students attend Mass upon occasion (3 times this year to date) during the school day. The law gives parents the right to request that the student be released from public school classes for religious instruction up to two hours per week. The parents of each St. Francis and Immaculate Conception student filed such a written request with public school officials, whereupon the requests were approved.

d) A Coordinating Council, comprised of students, teachers, and administrators of public and parochial segments was proposed and reluctantly rejected, since the degree of entanglement was suspect.

e) Student I/D cards were not provided for dual enrollment students because of the time required to process students at Senior High and Junior High, and because of equipment breakdown. This will be rectified in 72-73.

2. Non-resident students (Hannah) may be accepted in a program of this nature without tuition charge as long as appropriate provision is made in the State Aid Act. If the Act does not provide for this, non-resident students must be charged tuition.

If circumstances should require payment, a change in district tuition policy must also be considered.

The Complication: Too often the legislature does not pass a State Aid Act until late summer or fall, which makes it impossible to determine the status of non-resident students until the opening of school.

3. As the public school revises its curriculum offerings, it becomes more difficult to offer identical programs in a low-enrollment situation.

4. The determination of what does and what does not constitute "excessive entanglement" will continue to be a subjective judgment.

parties had to coordinate the timing of their separate programs. The court has no doubt that these details were smoothly resolved and that each independent system acted with the best interests of the students in mind. It may also be true, as testified, that the public school authorities independently decided which courses the public schools would offer. Yet it is impossible to believe that those authorities would have offered a course at the Annex which would duplicate a course offered by St. Francis High School, or that conversely St. Francis High School would itself offer courses which would duplicate the public school courses being offered in the second floor Annex. In fact, the evidence shows not one example of duplication in course offerings in the eight years the dual enrollment program has existed in the Annex. The consideration which the public school authorities gave to the needs and interests of the St. Francis students is evidenced by Assistant Principal Bradley's testimony that the Annex discontinued French III when only three St. Francis students expressed an interest in the course. There was no apparent effort made to divert other public school students to the Annex class.

In fact, the Annex program and the St. Francis program mesh together smoothly to provide a single high school curriculum as indeed they must where all students are enrolled at St. Francis. The evidence shows that the courses taken by St. Francis students at the Milliken Street campus were for the most part non-required courses such as drafting, shop, data processing, family living and co-operatives. For most students, the Annex and St. Francis schools together provide a complete high school education. Such a perfect fit between separate schools cannot be achieved without considerable interaction and cooperation.

The sensitivity of the public school authorities to the needs of the parochial schools is again illustrated by the termination of the shared time program at Immaculate Conception School. When the parochial authorities indicated a willingness to resume responsibility for the courses formerly offered by Immaculate Conception School, the public school authorities readily dropped their own overlapping courses.

The cited Supreme Court decisions, particularly *Meek, Lemon* and *Walz,* make it clear that the potential for excessive entanglement is far greater where the public schools attempt to shoulder a part of the traditional educational curriculum for non-public school students than where the public school system takes over an entire area of non-traditional and specialized education, such as remedial, therapeutic and guidance services. In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Supreme Court found the provision of such services to non-public school students off the premises of the non-public schools to be constitutionally permissible. The importance to the decision of the nature of the services provided is most clearly reflected in a footnote to the opinion:

[T]he programs are not intended to influence the classroom activities in the non-public schools. Our Brother Marshall argues that certain stipulations . . . announce that guidance counseling will include planning and selection of particular courses. . . . We agree that such involvement with the day-to-day curriculum of the parochial school would be impermissible. We, however, do not so read the stipulations. Rather, we understand them to recognize that a guidance counselor will engage in broad-scale, long-term planning of a student's career choices and the general areas of study that will further those choices. Our Brother Marshall also argues that the stipulations reflect an understanding that remedial service teachers under paragraph (I) will plan courses of study for use in the classroom. . . . Such a provision would pose grave constitutional questions. The stipulations, however, provide only that the remedial service teacher will keep the classroom teacher informed of the action taken. App. 49. We do not understand the stipulations to approve planning of classroom activities.

*Id.* at 246, n. 13, 97 S.Ct. at 2604.

The court concludes that, far from supporting the validity of the dual enrollment

program, as defendants urge, *Wolman* clearly indicates that public school involvement with the day-to-day curriculum of the parochial students which included only guidance counseling and planning and selection of particular courses, would be impermissible. The involvement here is obviously far more pervasive. The court finds nothing in *Wolman* to indicate any intent on the part of the Supreme Court to retreat from its firmly held three-pronged test, and particularly from its requirement that there be no excessive entanglement with religion.

### B. Personnel Assignments

The defendants insist the school district has exercised absolute neutrality in the selection of teachers and administrators on the Annex staff. This claim of neutrality is belied, however, by the individuals chosen to fill these positions and the resultant need to engage in constant surveillance of their activities.

The person in the position of Annex principal, for example, is officially considered a wing supervisor, or assistant principal of Traverse City High School. Since the inception of the Annex, both Annex principals have been male, both were recruited from Muskegon Catholic Central High School, and both have also acted as football coach of the St. Francis High School team. Further, a former St. Francis principal and teacher, Mr. James Rossi, now teaches at the Annex and continues to coach the St. Francis basketball team. Thus, both the football and basketball coaches for the St. Francis teams are Annex teachers. While these circumstances may be purely fortuitous, the critical fact is that the dual nature of the functions performed by these persons requires continual surveillance to assure that their selection was, in fact, truly neutral.

The identification of Annex personnel with St. Francis is further illustrated by the fact that some of the teachers hired for Annex positions formerly taught at St. Francis. In fact, the circumstances of the Annex program make it inevitable that Annex teaching assignments will be more attractive to individuals of the Catholic faith.

The public school teachers assigned to the Annex are largely isolated from public school activities. Further, the evidence shows that the Traverse City School District has recruited teachers for the Annex positions separately from its recruitment for the Milliken Street campus by designating each opening as either an Annex or Senior High position. Thus a natural selection process results from the relative isolation of the Annex teachers from the rest of the public school system and the separate recruiting practices.

The former Assistant Superintendent of Traverse City Public Schools, Mr. Eugene H. Lawler, testified that he directed the Curriculum Director and department heads to monitor the courses taught by the former St. Francis teachers to determine whether religion was impermissibly injected into their courses. Mr. Lawler testified that "it was a precautionary step which we felt should be taken . . . to say yes, we have done everything possible to be sure that this has been and is a public school program." Tr. p. 480.

The need for surveillance to assure the neutral selection of teachers and administrators and to assure that those hired do not impermissibly inculcate religion into their public school duties itself evidences the danger of excessive entanglement. It is precisely this kind of surveillance which the Supreme Court found to represent excessive entanglement in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) and *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

### C. Student Body Identity

Except for occasional public school students enrolled in driver training, all of the public school courses offered at the Annex are attended exclusively by students enrolled in St. Francis High School. The Annex classes are theoretically open to all public school students, and notices to that effect have been posted in the public schools. If the students and community regarded the Annex as a true public school, one would expect some cross-over in attend-

ance from the Milliken Street campus. Undoubtedly, a number of public school students live in the immediate vicinity of the St. Francis building. For many of these students it would appear to be more convenient to attend a number of courses at the Annex. Nonetheless, in eight and one-half years not one full-time public school student has ever attended a class at the Annex other than driver's education.

The defendants urge that this fact is unimportant if the classes are available to all students, regardless of their religious affiliation or belief. Of course, limiting attendance at the Annex to those students enrolled at St. Francis would constitute a patent violation of the First Amendment. However, the mere absence of such a restriction is not and cannot be sufficient. The inescapable truth is that the complete integration of the Annex with the parochial school results in a *de facto* limitation of Annex classes to St. Francis students, requiring continued surveillance to avoid further and excessive entanglement.

### D. Student Discipline

The Assistant Principal, Ralph Bradley, testified that generally the Annex and St. Francis authorities are independently responsible for discipline within their own school areas. However, he acknowledged that he did occasionally discuss disciplinary problems of individual students with the principal of St. Francis. While he indicated that he always made an independent evaluation of the discipline to be imposed, Bradley testified that when he disciplined or suspended a student from the Annex, that student was also suspended by St. Francis. Conversely, he observed that when a student was suspended for misconduct in St. Francis, while he was not requested to and did not himself ever suspend a student on this ground from attendance at the Annex, that student invariably failed to attend the Annex classes for the period of suspension imposed by the St. Francis authorities. He further testified that when a student suspended by St. Francis but not by the Annex fails to attend Annex classes, the student's

absence is not considered unexcused. Instead, the Annex considers the student absent due to suspension, as he would be if he were suspended by the public schools. That the public school official primarily charged with student discipline at the Annex is also affiliated with the parochial school through its athletic program similarly can hardly be ignored as a factor in maintaining good discipline at the Annex.

Once more, it is not the particular method of cooperation between the principal at the Annex and the officials of St. Francis which is at issue, but the fact that the coordination which naturally (and beneficially) occurs presents yet another example of continuing entanglement requiring constant surveillance. For example, a student could possibly be suspended by St. Francis High School for an infraction of rules relating to the practice of religion in that school. If the student then failed to attend Annex classes, as has been the pattern, he would be administratively treated as if he had been suspended from a public school, although there might not be any direct imposition of discipline by the public authorities. This very act of sensible cooperation presents the danger of involvement in the parochial school's religious programs.

### E. Religious Services

The observance of religious holidays and the periodic holding of religious services during school hours was another subject of proof in this case. While there are no religious observances or other outward signs of religion in the Annex portion of the building, approximately once every three weeks religious services are held during regular school hours at St. Francis. This court recognizes that the release of public school students from classes to attend religious activities is constitutionally permissible, *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and under Michigan law released time is required, upon request, for a maximum of two hours per week for all public school students. M.C.L.A. § 340.-732(e); M.S.A. § 15.3732(e). However, be-

cause all of the Annex students are also St. Francis students, the entire Annex schedule is rearranged and Annex classes are shortened on days when St. Francis religious services are scheduled. Thus students are not excused individually as a matter of accommodation to personal religious beliefs; instead the entire public school program is rearranged to accommodate a particular religious service. In the court's opinion, the practice is altogether sensible. At the same time, it is also altogether entangling.

### F. Miscellaneous Contacts

Since the Annex student body is composed entirely of St. Francis students, St. Francis school activities generally affect the Annex program. When St. Francis activities such as team outings, pep rallies and assemblies require the presence of students during their Annex class hours, the St. Francis principal informs the Annex supervisor, and those students are excused from Annex classes. As a matter of courtesy, the Annex supervisor reports Annex attendance figures to the St. Francis principal. Further, the Annex has no parent teacher organization and holds no open houses but Annex teachers are free to open their classrooms during St. Francis open houses. All of these contacts indicate the interdependence of the two schools. The totality of circumstances indicate that the two spheres of religion and state have in effect merged in the effort to educate a group of students. Although the cooperation evidenced between these authorities is commendable, it runs afoul of the First Amendment.

## VI. CONCLUSION

The defense in this case has principally centered upon efforts to show that the dual enrollment system has worked extremely well in Traverse City. Abundant proof supports the defendants' claim that the program has been operated smoothly over the years by honest administrators dedicated to preserving what their state courts had advised them were the necessary constitution-al limitations upon state involvement in religious education. To this end the defendants offered convincing proof of the high quality of both parochial and public education in Traverse City and of the benefits which have accrued to students and taxpayers alike by the dual enrollment program. Defendants point also to a very high degree of public acceptance, resulting from the worth of the programs and the enlightened and tolerant atmosphere which prevails in the Grand Traverse community.

Although Catholics constitute but 20% of the area population, not one instance of religious intolerance or strife was brought out during the trial. Public approval of the program was shown to be nearly unanimous.

Under such circumstances it is particularly difficult for the court to explain to the defendants why such an otherwise worthwhile state of affairs cannot be allowed to continue and why a federal court should feel the need to intervene at all. The short and dispositive answer, of course, is that the program clearly violates the Establishment Clause of the First Amendment as it has been interpreted over the years by the United States Supreme Court. Beyond that, however, is the historical perspective in which the First Amendment was adopted and the role it has played in fostering a robust democratic society in which religious freedom exists to enrich the lives of its citizens.

The lessons which history teaches are not confined to the past, nor are they limited to any one religious persuasion or any one area of the world. They are universal and in this perspective the tolerant and generally enlightened coexistence of religious freedom and democratic government in the United States cannot be viewed as merely accidental. While some may urge that religion and democratic government have both thrived in America in spite of the First Amendment, the more likely truth, given the state of intolerance and oppression elsewhere in the world is that they have thrived

here precisely because of it. Clarence Darrow, though not known as a religious man, captured the inevitable tension which exists between government and religion very aptly when he stated: "The realm of religion . . . is where knowledge leaves off, and where faith begins, and it never has needed the arm of the State for support, and wherever it has received it, it has harmed both the public and the religion that it would pretend to serve." [8]

## VII. RELIEF

A separate and final judgment will enter in favor of plaintiffs and against defendants. That judgment will:

A. Declare, pursuant to 28 U.S.C. § 2201, that the dual enrollment program which has been established and carried out by the Traverse City Area Public School District since 1971, through the use of premises leased from the Grand Traverse Area Catholic Schools, is violative of the Establishment Clause of the First Amendment to the United States Constitution because the program, while having a secular purpose, has the primary effect of advancing religion, and because the program fosters an excessive government entanglement with religion.

B. Permanently enjoin the continued operation of the dual enrollment program from and after September 1, 1980.

---

8. Tr. of Oral Arg. 7, *Scopes v. State*, 154 Tenn. 105, 289 S.W. 363 (1927) (on file with Clarence Darrow Papers, Library of Congress) (punctuation corrected), quoted by Mr. Justice Stevens in *Wolman v. Walter*, 433 U.S. 229, 264, 97 S.Ct. 2593, 2614, 53 L.Ed.2d 714 (1977).