SNYDER v CHARLOTTE PUBLIC SCHOOL DISTRICT

Docket No. 71152. Argued October 5, 1983 (Calendar No. 15).—Decided December 28, 1984. Released February 11, 1985. Rehearing denied 422 Mich 1201.

David Snyder for himself and as next friend of Brenda Snyder, a minor, and Patricia Snyder brought an action in the Eaton Circuit Court against the Charlotte Public School District, seeking to compel the district to enroll Brenda Snyder, a student at a private nondenominational Christian academy, in a sixth-grade band course at a district school. The court, Richard E. Robinson, J., ruled that public schools are not required to offer shared time instruction to private school students and that neither the plaintiffs' First nor Fourteenth Amendment rights had been violated. The Attorney General was permitted to intervene in behalf of the plaintiffs on appeal. The Court of Appeals, D. E. Holbrook, Jr., P.J., and McDonald, J. (T. M. Burns, J., dissenting), affirmed (Docket No. 60659). The plaintiffs appeal.

In an opinion by Justice Cavanagh, joined by Chief Justice Williams and Justices Kavanagh and Levin, the Supreme Court *held:*

If a school district offers nonessential elective courses to public school students, the courses must also be offered to resident nonpublic school students on a shared time basis. Where shared time instruction is conducted on public school premises, no violation of the Establishment Clause occurs; the effect of shared time instruction is to provide secular public

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 6-9] 68 Am Jur 2d, Schools § 304.5.

[2, 8] 68 Am Jur 2d, Schools § 304.

Right of school authorities to release pupils during school hours for purpose of attending religious education classes. 2 ALR2d 1371.

[3, 5, 6] 68 Am Jur 2d, Schools § 283 *et seq.*

Validity of state regulation of curriculum and instruction in private and parochial schools. 18 ALR4th 649.

[4, 9] 68 Am Jur 2d, Schools § 219 *et seq.*

[5] 68 Am Jur 2d, Schools §§ 227-233.

What constitutes a private, parochial, or denominational school within statute making attendance at such school a compliance with compulsory school attendance law. 65 ALR3d 1222.

instruction to part-time nonpublic school students regardless of whether they are enrolled in religious or secular nonpublic schools.

1. Instruction of nonpublic school students in secular, general curriculum subjects on public school premises is shared time instruction. Shared time has been accepted as a method of education in Michigan for over 60 years and is consistent with the state's policy of providing and fostering education and the right of all school-age children to public education. General supervision of public education is vested in the State Board of Education. Local districts possess only those powers expressly or impliedly granted by statute. Because local boards of education have the power to establish grades and determine courses of study, they have authority to offer shared time instruction.

2. Public schools are open to all residents of a district who meet age requirements. The right to public education is not conditioned upon full-time attendance. Attendance for the entire school day is not required, and students customarily are granted "released time" for religious classes away from the public school or to attend college classes part-time. Part-time students are subject to reasonable rules and regulations of the public school.

3. Attendance at school for school-age children is compulsory. A child must attend either a public or a state-approved nonpublic school. Nonpublic schools must provide a basic curriculum, including such subjects as reading, mathematics, and writing; however, the course of instruction need not be identical to that of the public schools. The public schools are not required to provide basic courses on a shared time basis to nonpublic students. Requiring shared time instruction in such courses would thwart the Legislature's requirement that nonpublic and public schools offer comparable basic education, would violate compulsory attendance laws, and might constitute impermissible direct aid to nonpublic schools. Nonessential, elective courses need not be taught in nonpublic or public schools. However, where the public school offers such courses to public school students, it must also offer them to resident nonpublic school students.

4. Shared time programs in and of themselves do not create unconstitutional religious entanglements. State and federal government is forbidden from setting up a church, from passing laws which aid one or all religions or which favor one religion over another, and from levying taxes to support religious activities or institutions. However, total separation is not possible or even desirable, and some relationship between church

and state is inevitable. The state must accommodate, not merely tolerate, all religions. Callous indifference was never intended under the Establishment Clause and may clash with the dictates of the Free Exercise Clause. Even where benefits to religion appear substantial, there is no conflict with the Establishment Clause unless it is clear that the action resulting in benefits was motivated wholly by religious considerations.

5. Shared time instruction clearly is not intended to benefit one or all religions. Rather, the purpose is secular: to provide educational opportunities at public schools for all resident school-age children whether they attend public or religious or secular nonpublic schools. The primary effect of shared time instruction is to provide secular public instruction to part-time nonpublic students. The fact that shared time instruction enables nonpublic schools to expend funds on other parts of their curriculum, including religious studies, does not mean that such schools are directly benefited. Programs that have provided bus transportation for nonpublic students, textbook loans, standardized academic testing, and general health and welfare services have been upheld under federal law. The rationale for upholding such services applies equally to shared time instruction.

6. In this case, the public school offered a band class that was not offered by the nonpublic school. The plaintiffs' daughter was a resident of the district and had a right to enroll in the public school. There is no basis on which to conclude that admitting her to the class would be any less economical or convenient than to admit her as a full-time student. Any administrative difficulties would be minimal and would not disrupt the program. The district releases older students to attend community college classes. In addition, the district would receive state aid for a part-time student.

Reversed.

Justice Brickley, joined by Justices Ryan and Boyle, dissenting, stated that the issue is not whether a shared time instruction program is desirable, but whether under the School Code it must be offered. The provision of the code relied upon by the majority was not intended to allow a child who is a resident of a district to select parts of the district's program to attend. That question is not addressed by the provision. The provision was also not intended to guarantee a right to attend school. Read literally, the provision is clearly intended to indicate the age at which children may begin to attend school and to distinguish between districts that provide kindergarten instruction and those that do not. To maintain that the provision

provides the basis for mandating shared time not only strains the provision, but tortures it. There is no statutory justification for judicial intervention in educational policy making. It was not shown that plaintiff's constitutional rights have been violated by the defendant's not having a shared time program that would allow her to participate in a band course on a selective basis.

123 Mich App 56; 333 NW2d 542 (1983) reversed.

### OPINION OF THE COURT

1. SCHOOLS — SHARED TIME.

If a school district offers nonessential elective courses to public school students, the courses must also be offered to resident nonpublic school students on a shared time basis (MCL 380.1147; MSA 15.41147).

2. SCHOOLS — SHARED TIME — ESTABLISHMENT OF RELIGION.

Where shared time instruction is conducted on public school premises, no violation of the Establishment Clause occurs; the effect of shared time instruction is to provide secular public instruction to part-time nonpublic school students regardless of whether they are enrolled in religious or secular nonpublic schools (US Const, Am I).

3. SCHOOLS — SHARED TIME.

A school district has authority to provide shared time instruction to nonpublic school students by virtue of its power to establish and carry on grades, schools, and departments, determine courses of study, and to cause students attending school in the district to be taught in such schools and departments (MCL 380.1282; MSA 15.41282).

4. SCHOOLS — SHARED TIME — RIGHT TO EDUCATION.

Public schools are open to all residents of a district who meet age requirements, and the right to public education is not conditioned upon full-time attendance (MCL 380.1147, 380.1561[3][e]; MSA 15.41147, 15.41561[3][e]).

5. SCHOOLS — COMPULSORY ATTENDANCE — NONPUBLIC SCHOOLS — CURRICULUM.

A school-age child that does not qualify for an exception must attend either a public or a state-approved nonpublic school; nonpublic schools must provide a basic curriculum, including such subjects as reading, mathematics, and writing; however, the course of instruction need not be identical to that of the public schools (MCL 380.1561[3][a]; MSA 15.41561[3][a]).

6. SCHOOLS — SHARED TIME — CURRICULUM.

Public schools need not provide basic courses to nonpublic school students on a shared time basis; however, where public schools offer nonessential, elective courses to public school students, they must also be offered to nonpublic students in a shared time instruction program (MCL 380.1147; MSA 15.41147).

7. SCHOOLS — SHARED TIME — ESTABLISHMENT OF RELIGION.

Shared time instruction of sectarian, nonpublic school students in and of itself is not violative of the Establishment Clause even where benefits to religion appear substantial; it is only where it is clear that the program was motivated wholly by religious considerations that a conflict with the clause would exist (US Const, Am I).

8. SCHOOLS — SHARED TIME — ESTABLISHMENT OF RELIGION.

Shared time instruction clearly is not intended to benefit one or all religions; rather, the purpose is secular: to provide educational opportunities at public schools for all resident school-age children whether they attend public or religious or secular nonpublic schools (MCL 380.1147; MSA 15.41147).

DISSENTING OPINION BY BRICKLEY, J.

9. SCHOOLS — SHARED TIME — RIGHT TO EDUCATION.

*Language in the School Code that a person who is a resident of a school district who is at least five years of age on the first day of enrollment of a school year "shall have a right" to attend school in the district cannot be used as the basis to mandate shared time instruction programs with nonpublic schools; read literally, the provision is clearly intended to indicate the age at which children may begin to attend school and to distinguish between districts that provide kindergarten instruction and those that do not (MCL 380.1147; MSA 15.41147).*

*Charles M. Zwick* and *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young* and *Paul J. Zimmer,* Assistant Attorneys General, for the plaintiffs.

*Thrun, Maatsch & Nordberg, P.C.* (by *Thomas J. Nordberg* and *Michael A. Eschelbach),* for the defendant.

Amici Curiae:

*Linda L. Bruin* for Michigan Association of School Boards.

*Levin, Levin, Garvett & Dill* (by *Erwin B. Ellmann*) for Michigan Education Association.

*Miller, Cohen, Martens & Sugerman, P.C.* (by *Mark H. Cousens*), for Michigan Federation of Teachers.

*Stuart D. Hubbell* for Michigan Association of Nonpublic Schools.

CAVANAGH, J. Plaintiffs are residents of the defendant Charlotte Public School District. They pay property taxes to the district for school operating purposes. In the 1981-1982 school year, plaintiffs enrolled their daughter Brenda as a full-time sixth grade student in the Charlotte Christian Academy, a private nondenominational school.

Since the academy does not offer a band course, plaintiffs attempted to enroll Brenda in the sixth grade band course offered in defendant's public schools. Brenda has her own musical instrument and plaintiffs are willing to transport her to and from class. Brenda would attend band at the time and place which this course is provided to full-time public school students. Defendant admits that there is room in the class for Brenda and that it would receive state school aid for her part-time attendance. Nevertheless, defendant refused to permit her enrollment because it does not offer any shared time courses or permit dual enrollment. Its policy is to limit enrollment in all classes to full-time students only. However, defendant allows its public school students to attend classes

at local community colleges during the school day for credit.

Plaintiffs filed suit to compel defendant school district to enroll Brenda in the band class. They argued that Brenda's exclusion violated her statutory right to attend public school in the school district in which she resides. MCL 380.1147; MSA 15.41147. In addition, defendant's policy allegedly violated plaintiffs' First Amendment right to freely exercise their religious beliefs and their Fourteenth Amendment right to equal protection under the law. Following a bench trial, the circuit court ruled that Michigan public school systems are not required to offer shared time instruction and that plaintiffs' First and Fourteenth Amendment rights had not been violated.

Plaintiffs appealed, and the Attorney General was allowed to intervene in their behalf. The Court of Appeals affirmed, over a lengthy dissent. *Snyder v Charlotte Public School Dist,* 123 Mich App 56; 333 NW2d 542 (1983). This Court granted plaintiffs' and the Attorney General's application for leave to appeal. 417 Mich 1041 (1983). The Michigan Education Association, Michigan Federation of Teachers, Michigan Association of School Boards, and Michigan Association of Nonpublic Schools have filed amici curiae briefs.

# I

"Shared time" instruction was aptly described in *Traverse City School Dist v Attorney General,* 384 Mich 390, 411, fn 3; 185 NW2d 9 (1971):

" 'As generally used in current literature in the field of education, the term "shared time" means an arrangement for pupils enrolled in nonpublic elementary or secondary schools to attend public schools for in-

struction in certain subjects . . . . The shared time provision is or would be for public school instruction for parochial school pupils in subjects widely (but not universally) regarded as being mainly or entirely secular, such as laboratory science and home economics.'

\* \* \*

"As this quotation indicates, shared time is an operation whereby the public school district makes available courses in its general curriculum to both public and nonpublic school students normally on the premises of the public school."

There are three significant differences between shared time and direct financial aid to nonpublic schools (also known as parochiaid):

"First, under parochiaid the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, parochiaid permitted the private school to choose and to control a lay teacher whereas under shared time the public school district chooses and controls the teacher. Thirdly, parochiaid permitted the private school to choose the subjects to be taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects. These differences in control are legally significant.

"Obviously, a shared time program offered on the premises of the public school is under the complete control of the public school district . . . ." *Id.,* pp 413-414.

## II

Plaintiffs argue that MCL 380.1147; MSA 15.41147 establishes the statutory right of school-age children to attend public schools in the district in which they reside. The Legislature has not conditioned (or authorized local boards of education to condition) this right upon full-time attendance. Plaintiffs conclude that Brenda must be

allowed to attend all or part of the public school program. They criticize the Court of Appeals majority for limiting this statutory right because of the speculative potential for excessive entanglement of church and state which shared time allegedly presents.

Defendant responds by citing numerous statutory provisions which authorize local boards of education to set curriculum and determine the operating policies of public school districts. Courts may not disturb a board's policy decision unless it is arbitrary and unreasonable. Defendant maintains that it has adequately justified its full-time enrollment policy. Defendant asserts that part-time students would dilute the school program for full-time students and take a disproportionate amount of scarce resources; full-time attendance in a single school is administratively and educationally advantageous; part-time admission would cause an overall decline in full-time enrollment, resulting in decreased state aid; and extensive coordination between public and private schools would be required.

A

Although public education is not a fundamental right granted by the federal constitution, it is not merely some governmental benefit which is indistinguishable from other forms of social welfare legislation. *Plyler v Doe,* 457 US 202, 221; 102 S Ct 2382; 72 L Ed 2d 786 (1982). See also *San Antonio Independent School Dist v Rodriguez,* 411 US 1, 30; 93 S Ct 1278; 36 L Ed 2d 16 (1973). "[E]ducation is perhaps the most important function of state and local governments." *Brown v Topeka Bd of Ed,* 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954). Whenever the state has undertaken to

provide education to its people, this right must be made available to all on equal terms. *Id.* See also *San Antonio, supra,* pp 29-30.

This state's policy of encouraging education is set forth in Const 1963, art 8, § 1:

"Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

This provision evidences a settled state purpose of providing, fostering, and protecting educational facilities for all. *Dennis v Wrigley,* 175 Mich 621, 625; 141 NW 605 (1913).

Const 1963, art 8, § 2 provides for the establishment of the public elementary and secondary school system:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."

See also MCL 380.1146; MSA 15.41146.

The statutory right of each school-age child to attend public school in the district in which he resides is set forth in § 1147 of the School Code of 1976:[1]

"(1) A person, resident of a school district not maintaining a kindergarten and at least 5 years of age on the first day of enrollment of the school year, *shall have a right* to attend school in the district.

"(2) In a school district where provision is made for kindergarten work, a child, resident of the district, *is entitled to enroll* in the kindergarten if the child is at

[1] 1976 PA 451, MCL 380.1 *et seq.;* MSA 15.4001 *et seq.*

least 5 years of age on December 1 of the school year of enrollment. In a school district which has semiannual promotions, a child, resident of the district, *is entitled to enroll* in kindergarten for the second semester if the child is at least 5 years of age on March 1 of the year of enrollment." MCL 380.1147; MSA 15.41147. (Emphasis added.)

The prior school codes contained substantially similar language.[2] These earlier provisions have been interpreted to prevent a school board from excluding any resident because of race, color, or religious beliefs and to provide an equal right to all schools, irrespective of such distinctions. *People ex rel Workman v Detroit Bd of Ed,* 18 Mich 400, 410 (1869). The 1976 code was primarily intended to be a recodification of existing law. See 1976 Journal of the Senate 2622.

Parents and guardians have a corresponding duty to send their children to public schools, subject to several exceptions:

"(1) Except as provided in subsections (2) and (3), every parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday, shall send that child to the public schools during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled. In a school district which maintains school during the entire calendar year and in which the school year is divided into quarters, a child shall not be compelled to attend the public school more than 3 quarters in 1 calendar year, but a child shall not be absent for 2 consecutive quarters.

\* \* \*

"(3) A child shall not be required to attend the public schools in the following cases:

---

[2] See 1955 PA 269, § 356; 1949 PA 315, § 9; 1927 PA 319, Pt II, ch 2, § 9; 1881 PA 164, ch III, § 18; 1867 PA 34, § 28.

"(a) A child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade, as determined by the course of study for the public schools of the district within which the nonpublic school is located." MCL 380.1561; MSA 15.41561.[3]

Section 1561(3)(a) recognizes the constitutional right of parents to send their children to either public or private schools. See *Pierce v Society of Sisters*, 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925).

General supervision over public education is vested in the State Board of Education. Const 1963, art 8, § 3. The state may establish school curricula either by statute or by delegating its authority to local school boards. *Mercer v Michigan State Bd of Ed*, 379 F Supp 580, 585 (ED Mich, 1974), *aff'd* 419 US 1081; 95 S Ct 673; 42 L Ed 2d 678 (1974). Local school districts and officers, however, possess only those powers which statutes expressly, or by reasonably necessary implication,

---

[3] We agree with the dissent's observation that § 1147, if read literally, provides that children who live in a school district which does not maintain a kindergarten have a right to attend "school" under subsection (1). If a kindergarten is maintained, however, subsection (2) only entitles children to enroll in kindergarten. The Legislature surely did not intend to deprive children of their right to attend school within their district during succeeding grades simply because the district maintains a kindergarten. The dissent also correctly notes that § 1147 sets forth residency and minimum age requirements for school children. However, the statute is written in terms of the child's "right" to attend school and "entitlement" to enroll, rather than merely enunciating admissions requirements.

By couching § 1147 in terms of a child's "right" and "entitlement" to attend school, the Legislature wished to prevent public school districts from arbitrarily refusing admission to children who live in the district and meet the age requirements. Note that under § 1561(1), parents and guardians must send their children to public schools. There is no requirement that the school be in the district in which the child resides. When read together, § 1147 and § 1561 guarantee children the right to attend neighborhood public schools, but gives them the option of obtaining their education at other facilities.

grant to them. *Senghas v L'Anse Creuse Public Schools,* 368 Mich 557, 560; 118 NW2d 975 (1962); *Jacox v Bd of Ed of Van Buren Consolidated School Dist,* 293 Mich 126, 128; 291 NW2d 247 (1940).

Sections 1282 and 1300 of the School Code set forth some of those duties and powers:

"The board of a school district shall establish and carry on the grades, schools, and departments it deems necessary or desirable for the maintenance and improvement of the schools, determine the courses of study to be pursued, and cause the pupils attending school in the district to be taught in the schools or departments the board deems expedient." MCL 380.1282; MSA 15.41282.

"The board of a school district shall make reasonable regulations relative to anything necessary for the proper establishment, maintenance, management, and carrying on of the public schools of the district, including regulations relative to the conduct of pupils concerning their safety while in attendance at school or enroute to and from school." MCL 380.1300; MSA 15.41300.

A school board's authority to offer shared time instruction is derived in particular from § 1282. See *Traverse City, supra,* 384 Mich 411, fn 3.

In reviewing a school board's decision, a court cannot substitute its judgment for that of the board. Its inquiry is limited to whether the board's actions were arbitrary and unreasonable. The actions are presumed to be reasonable and proper unless there is a clear showing of abuse. *Hiers v Detroit Superintendent of Schools,* 376 Mich 225, 234-235; 136 NW2d 10 (1965).

There is no legislation which specifically requires or limits shared time courses or dual enroll-

ment.[4] Nevertheless, shared time has been an accepted method of education in this state for over 60 years. *Traverse City, supra,* p 407, fn 2. The Legislature has acknowledged shared time instruction in the State School Aid Act of 1979[5] by authorizing aid to school districts for nonpublic school children who attend public schools part-time. See MCL 388.1606, 388.1711; MSA 15.1919(906), 15.1919(1011); 1979 AC, R 340.6(b), 1984 AACS, R 340.7(2). See also *Morton v Chicago Bd of Ed,* 69 Ill App 2d 38, 49; 216 NE2d 305 (1966).

In addition, the Legislature has not required attendance in either a public or private school for the entire school day.[6] In fact, public school students are allowed to attend religious instruction

---

[4] School districts are required to offer to nonpublic school students driver education, MCL 257.811; MSA 9.2511; special education programs for handicapped persons residing in the school district, MCL 380.1751; MSA 15.41751; bus transportation under certain circumstances, MCL 380.1321, 380.1322; MSA 15.41321, 15.41322; and auxiliary services which are being offered to public school students, MCL 380.1296; MSA 15.41296. Auxiliary services are special educational services designed to remedy physical and mental deficiencies and to provide for the physical health and safety of the children. *Traverse City, supra,* 384 Mich 418-419. Band instruction cannot be considered an auxiliary service since it is not enumerated in § 1296 or any other section. *Id.,* p 420.

The dissent maintains that the Legislature, by statutorily requiring districts to offer only driver training, special education, bus transportation, and auxiliary services to nonpublic school students, thereby evidenced an intent that school districts need not offer other "courses" to nonpublic school children. However, the *Traverse City* Court stated that these aforementioned services are not educational in nature, but general health, safety, and welfare matters which have only an incidental relation to the instruction of nonpublic school students. *Id.,* p 419. In other words, these statutes do not involve courses of instruction or school enrollment, but merely services which the Legislature wished to extend to all children.

[5] 1979 PA 94, MCL 388.1601 *et seq.;* MSA 15.1919(901) *et seq.*

[6] *Cf. Special District for the Education & Training of Handicapped Children of St Louis County v Wheeler,* 408 SW2d 60 (Mo, 1966); 1971 Missouri OAG, No 144 (Missouri compulsory attendance law requires students to attend one school for at least six hours per day; any part-time attendance at a public school by a nonpublic school student must be in addition to the regular six-hour school day).

classes away from the public school during the school day for up to two class hours per week. MCL 380.1561(3)(e); MSA 15.41561(3)(e). (This is traditionally referred to as "released time.")

## B

In *Traverse City,* this Court ruled on the constitutionality of Proposal C, the amendment to Const 1963, art 8, § 2, which was ratified in the 1970 referendum. This "anti-parochiaid" amendment prohibited the direct or indirect use of public funds to aid or maintain a nonpublic school:

"No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, preelementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school *or at any location or institution where instruction is offered in whole or in part to such nonpublic school students.* The legislature may provide for the transportation of students to and from any school." (Emphasis added.)[7]

The Attorney General construed Proposal C to prohibit shared time instruction at public schools. OAG 1969-1970, No 4715, p 183 (November 3, 1970). In an opinion written by Justice WILLIAMS,

[7] The amendment was in response to 1970 PA 100, c 2, which authorized payments of public funds to eligible nonpublic schools to pay a portion of the salaries of lay teachers who taught secular subjects. This legislation was upheld in *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82; 180 NW2d 265 (1970), *app dis* 401 US 929; 91 S Ct 938; 28 L Ed 2d 210 (1971). For a complete history of this legislation, see *Traverse City,* 384 Mich 406-410, fns 1-2.

this Court found this to be "a shocking result" and struck down the above-emphasized language. *Traverse City, supra,* p 412. In a footnote, the Court stated that the question presented was "whether in certain situations state aid to nonpublic schools or their pupils is *mandatory." Id.,* p 431, fn 19. After concluding that banning shared time instruction would violate the federal Equal Protection and Free Exercise Clauses, the Court stated:

"This does not mean that a public school district must offer shared time instruction or auxiliary services; it means that if it does offer them to public school children at the public school, nonpublic school students also have a right to receive them at the public school." *Id.,* p 433.[8]

The parties argue over the meaning of this language. Plaintiffs interpret it to mean that a school board need not offer a particular class, but, once it decides to do so, nonpublic school children have the right to attend. Defendant argues that the *Traverse City* Court did not impose mandatory shared time instruction for every class offered in the district. If the district decides to offer a class on a shared time basis, then all nonpublic school children have the right to attend regardless of their religious affiliation.[9]

[8] Similar language was included in the conclusion of *Traverse City,* p 435:

"2. *Proposal C has no prohibitory impact upon shared time instruction wherever offered provided that* the ultimate and immediate control of the subject matter, the personnel and the premises are under the public school system authorities and *the courses are open to all eligible to attend the public school* . . . subject, of course, to the issue of religious entanglement." (Emphasis added.)

[9] At least one federal court has interpreted *Traverse City* as meaning that local boards of education have discretionary authority to provide shared time instruction. *Americans United for Separation of Church & State v Grand Rapids School Dist,* 546 F Supp 1071, 1076 (WD Mich, 1982), *aff'd* 718 F2d 1389 (CA 6, 1983), *cert gtd sub nom*

Justice ADAMS' partial concurrence in *Traverse City* shows that plaintiffs' interpretation is correct:

"I agree with Justice WILLIAMS that Proposal C does not prohibit shared-time instruction for private school students in the public schools.

\* \* \*

"[P]rograms offered in the public school [must] be made available to all students, whether from public or private schools, on an equal basis." *Id.,* pp 439-440.

Plaintiffs also persuasively argue that if Michigan voters could not prohibit shared time statewide by Proposal C, a local school board should not be able to do so in their district by a full-time enrollment policy.

Note, however, that the parties in *Traverse City* did not raise a statutory argument for or against shared time instruction. The decision was based entirely on federal constitutional law. Although *Traverse City* supports plaintiffs' constitutional arguments, we prefer to base our decision on § 1147 of the School Code, since it is well established that this Court will decline to address federal constitutional issues if state statutory relief is available.

C

Under § 1147, public schools are open to all residents of the school district who are at least five years old. This statutory right to public education is not conditioned upon full-time attendance. As previously noted, public school students may be

*Grand Rapids School Dist v Ball,* 465 US 1064; 104 S Ct 1412; 79 L Ed 2d 739 (1984). Any similar inference which may be drawn from this author's opinion in *Citizens to Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App 168; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976), was not intended.

excused for up to two hours per week for religious instruction. Defendant school district allows its high school students to attend community college classes during the school day for high school credit. Many public schools also have work-study programs and educational arrangements with vocational and artistic institutions. Such practices acknowledge the possibility that a child may receive his or her education from more than one institution.

Defendant school district argues that § 1282 and § 1300 of the School Code allow it to determine public school curriculum and operating policies. This power allegedly includes the ability to limit enrollment in classes to full-time public school students. This argument necessarily implies that § 1282 and § 1300 supersede a child's § 1147 right to attend public school. We disagree.

School boards were created for the purpose of organizing, maintaining, and locating schools for the education of all resident school-age children. If part-time instruction would tend to disorganize the school and handicap the school authorities in maintaining the school, then full-time attendance could be required. A school board's belief that part-time attendance would be detrimental is entitled to consideration and respect.

However, there is no basis for such a conclusion on this record. Arrangements could easily be made to limit disorganization and inconvenience. It would be just as easy, economical, and convenient (if not more so) to open these classes to nonpublic school students as it would be to provide these classes to them if they became full-time public school students. The administrative difficulties are minimal and Brenda's attendance (as well as other nonpublic school students' attendance) would ordinarily not be disruptive.

Defendant allows its older students to attend community college classes part-time during the school day. Problems concerning transportation, grading, and coordination of classes have obviously been solved. Other school districts in this state have successfully offered shared time courses for many years without problem. Defendant has not shown how full-time enrollment is "educationally advantageous." It would seem that a diverse student body would result in new perspectives to problems, stimulate the educational process, and engender respect and understanding for other students' beliefs and upbringing. Part-time students would still be subject to the school board's reasonable rules and regulations, thus minimizing disruption and disorganization. Nonpublic school students presumably are as disciplined and interested in learning as their public school counterparts.

Defendant has also not shown that the availability of shared time instruction would result in decreased full-time public school enrollment. Better education and discipline, as well as the instillation of religious and ethical ideals, are generally the reasons parents send their children to nonpublic schools, rather than the availability of shared time instruction. In fact, plaintiffs have continued to send Brenda to a nonpublic school despite the present unavailability of shared time courses because they believe that the school is a better educational and religious experience. The high cost of nonpublic school tuition is also a deciding factor for many parents. Finally, defendant admits that it would receive state school aid for part-time students.

## D

Case law from other jurisdictions is scarce. In *State ex rel School Dist of Hartington v Nebraska Bd of Ed,* 188 Neb 1; 195 NW2d 161 (1972), *cert*

*den* 409 US 921; 93 S Ct 220; 34 L Ed 2d 182 (1972), the Hartington School District entered into a lease with a Catholic high school to provide instructional activities and services for educationally deprived children in two of the high school's classrooms. The classes were to be conducted and funded pursuant to the Federal Elementary and Secondary Education Act of 1965. The school district was to have full control over the classrooms and educational program and no religious objects were to be displayed. The program and lease were upheld against state and federal constitutional challenges raised by the state board of education.

The constitutionality of allowing parochial school children to participate in the educational program was also raised. Federal law and regulations required that educationally deprived private school children within the public school district be allowed to participate in programs comparable to those provided to public school children. The Nebraska Supreme Court wrote:

"The Constitution of Nebraska specifically provides that no religious test or qualification shall be required of any student for admission to any public school. Art VII, § 11, Constitution of Nebraska. It would seem that an attempt to prohibit a student enrolled in a parochial school from participating in a program conducted by the public schools, solely because the student was enrolled in a parochial school, would violate this provision of the Constitution of Nebraska." *Hartington, supra,* p 4.[10]

The *Hartington* court also found that this "aid" was directed to nonpublic school children and

[10] The *Hartington* court, relying on *Traverse City,* also concluded that the federal Free Exercise and Equal Protection Clauses would be violated if nonpublic school children were excluded from public school programs. 188 Neb 5.

therefore did not violate the federal Establishment Clause. *Id.,* p 5.

The Michigan Constitution does not contain a provision identical to Art VII, § 11 of the Nebraska Constitution. However, Const 1963, art 8, § 2, which requires a school district to provide education without religious discrimination, can be interpreted in a similar manner.[11]

We recognize that a contrary conclusion was reached in *Thomas v Allegheny County Bd of Ed,* 51 Md App 312; 443 A2d 622 (1982). There, plaintiffs were private school students who had participated in an all-county music program offered by the public school board. In 1980, the board limited participation to those students enrolled in the public schools. Plaintiffs raised arguments identical to those raised here. The Maryland Court of Appeals addressed the constitutional arguments first and concluded that plaintiffs' rights under the

[11] The question of requiring shared time instruction was also decided in *Commonwealth ex rel Wehrle v Plummer,* 21 Pa D 182 (1911), aff'd *sub nom Commonwealth ex rel Wehrle v School Dist of Altoona,* 241 Pa 224; 88 A 481 (1913). The question presented there was whether nonpublic school students could be deprived of admission to a manual training school maintained by the public school system. The students' right to admission was upheld solely upon the basis of the Pennsylvania School Code. The code provided that a school district could establish and maintain additional schools and departments, such as manual training schools. Moreover, no pupil could be refused admission to these schools because he was being or had been educated in a nonpublic school. In contrast, Michigan has no similar statutory provision, except for driver's education, special education classes for the handicapped, and auxiliary services.

*Wehrle* was cited in a dissenting opinion in *Mitchell v Consolidated School Dist No 201,* 17 Wash 2d 61; 135 P2d 79, 88 (1943). The *Mitchell* court struck down a statute which provided bus transportation to nonpublic school children. In a dissenting opinion, Judge Mallery opined that the necessary inference from this position was that a pupil must be enrolled exclusively in a public school before he can use any of its facilities. He rejected this inference based in part on the Washington Constitution, which required that all resident children be educated without discrimination. The holding and language of *Wehrle* were discussed, but no mention was made of the statutory provision on which *Wehrle* was decided.

Free Exercise and Equal Protection Clauses had not been violated.

The *Thomas* court then analyzed § 7-101(a) of the education code, which provided that all individuals who are five years old and under twenty-one shall be admitted free of charge to Maryland public schools. Plaintiffs argued that since they were county residents and within the specified age limits, they were entitled to be admitted to the public schools or any portion thereof. The court refused to adopt such a "strained construction" of the statute. It was noted that under § 4-107, the board of education was authorized to maintain a reasonably uniform system of public schools and to determine the educational policies of the county school system. The *Thomas* court admitted that the administrative effect of allowing the participation of private school students in the band program appeared "trivial." However, it was particularly worried that if plaintiffs' position were adopted, there would be an unreasonable burden on the efficient administration of the public school system. It concluded that the legislature or school board could permit shared time instruction, but the court could not mandate enrollment on the basis of a strained statutory interpretation. *Id.,* pp 316-317, 319-320.

We do not believe that our interpretation of § 1147 is strained. Allowing Brenda and other nonpublic school students to participate in public school classes will not place an unreasonable burden on the public school system. As in *Thomas,* we find the administrative details involved in shared time instruction to be trivial, especially where a statutory right to such instruction exists. Defendant readily admits that it would have to educate these same children full time if they and their parents decided to forego private school education.

Private schools lessen the educational burdens of the public school system and substantially relieve the tax burden incident to the operation of the public schools.[12]

E

As previously noted, part-time students would be subject to the public school's reasonable rules and regulations as to conduct, attendance, homework, etc. Normally, the school board would determine the curriculum, when and where classes are to be offered and the number of students that can be accommodated. Since the school board has a duty to provide shared time instruction, this necessarily implies that it must provide "reasonable access" to the classes. This case does not present such problems—the band course is offered in the middle of the school day, defendant admits that it has room in the class for Brenda, and plaintiffs will provide Brenda's transportation to and from class.

However, not every class offered by a public school must be made available on a shared time basis. In order to meet the compulsory attendance laws, a nonpublic school child must attend "a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade . . . ." MCL 380.1561(3)(a); MSA 15.41561(3)(a).[13] This im-

[12] See fn 15.

[13] Both public and nonpublic schools are required to offer regular courses in the federal and state constitution, history, and government. A high school civics class is also required. MCL 380.1166; MSA 15.41166. There are no other courses, however, which a nonpublic school is statutorily required to offer.

The superintendent of public instruction is required to supervise all private, denominational, and parochial schools. MCL 388.551; MSA 15.1921. This section also provides that the courses of study in such schools shall be of the same standard as provided by the general school laws. The state's regulation of nonpublic school curricula

plies that the nonpublic school must provide a "core curriculum" for its students, such as basic reading, mathematics, writing, English, etc. If shared time instruction were required for all courses, it would be possible for a nonpublic school to offer a full curriculum to its students while conducting only a small percentage of the classes at the nonpublic school. This would thwart the Legislature's requirement that nonpublic and public schools offer comparable basic education to their respective students. More importantly, if public schools can be required to satisfy in any way a *parochial* school's statutory responsibility to provide a core curriculum to its students, this might constitute impermissible direct aid to the parochial school, rather than legitimate aid to the students which incidentally benefits the parochial school. See *Americans United for Separation of Church & State v Porter,* 485 F Supp 432, 437 (WD Mich, 1980), and Section III, *infra.*

Section 1561(3)(a) does not require that the nonpublic schools offer identical courses of instruction. If this were so, shared time would not be necessary. Thus, "nonessential elective courses," such as band, art, domestic science, shop, advanced math, and science classes, etc., need not be taught in nonpublic schools. These are the types of courses that have traditionally been offered on a shared time basis. Thus, once these types of courses are offered to public school students in the district, they must also be offered to resident nonpublic school students.

## III

Defendant and amici curiae do not contend that

consists of a simple review of the availability of various academic courses. *Sheridan Road Baptist Church v Dep't of Ed,* 132 Mich App 1, 6; 348 NW2d 263 (1984), *lv den* 419 Mich 916 (1984).

teaching shared time courses at public schools violates the federal Establishment Clause. However, the Court of Appeals majority denied plaintiffs relief in part because it believed that such a violation existed. The majority stated that the trial testimony indicated that implementation of a shared time program would require extensive coordination between public and nonpublic schools. This continuing need for surveillance over the integration of public and nonpublic curricula and functions supposedly presented too great a potential for excessive entanglement. The majority concluded that Brenda's statutory right to attend courses at public schools was subject to the limitations of the First Amendment. It was also conjectured that if Brenda had a right to attend band classes, this right would extend to other classes without restriction. Such a situation would be similar to that struck down in *Americans United for Separation of Church & State v Porter*, 485 F Supp 432 (WD Mich, 1980), where a parochial school was able to offer a full curriculum via shared time programs taught at the school. *Snyder, supra*, 123 Mich App 66-67.

The *Traverse City* Court stated that shared time in and of itself does not create unconstitutional religious entanglements, although special circumstances might create such problems. *Traverse City, supra*, 384 Mich 417. Although the Court did not engage in a formal Establishment Clause analysis, such an analysis reveals that no violation exists where shared time instruction is conducted on public school premises.

## A

The Establishment Clause of the First Amend-

ment commands that a state "shall make no law respecting an establishment of religion . . . ."[14] The Establishment Clause forbids the states and federal government from setting up a church, passing laws which aid one or all religions or prefer one religion over another, and levying a tax to support any religious activities or institutions. *Everson v Ewing Twp Bd of Ed,* 330 US 1, 15-16; 67 S Ct 504; 91 L Ed 711 (1946). It was designed to prevent sponsorship, financial support, and active involvement of the state in religious activity. *Walz v New York City Tax Comm,* 397 US 664, 668; 90 S Ct 1409; 25 L Ed 2d 697 (1970).

However, total separation is not possible in an absolute sense; some relationship between church and state is inevitable. *Lemon v Kurtzman,* 403 US 602, 614; 91 S Ct 2105; 29 L Ed 2d 745 (1971). In every Establishment Clause case, a court must reconcile the inescapable tension between preventing unnecessary intrusion of either the church or state into the precincts of the other and the reality that total separation is not possible. *Lynch v Donnelly,* 465 US 668, 672; 104 S Ct 1355; 79 L Ed 2d 604 (1984). Indeed, total separation is not necessarily desirable. *Committee for Public Education & Religious Liberty v Nyquist,* 413 US 756, 760; 93 S Ct 2955; 37 L Ed 2d 948 (1973). The constitution requires the state to accommodate all religions, not merely tolerate them, and forbids hostility toward any. "Callous indifference" was never intended by the Establishment Clause and may clash with the dictates of the Free Exercise Clause. *Lynch, supra,* p 673; *People ex rel McCollum v Dist No 71 Bd of Ed,* 333 US 203, 211-212; 68 S Ct 461; 92 L Ed 649 (1948). See also *Zorach v Clauson,*

[14] The First Amendment was made applicable to the states through the Fourteenth Amendment in *Murdock v Pennsylvania,* 319 US 105; 63 S Ct 870; 87 L Ed 1292 (1943).

343 US 306, 312-315; 72 S Ct 679; 96 L Ed 954 (1952).

Traditionally, a three-part test has been employed in analyzing Establishment Clause cases:

"In the line-drawing process we have often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." *Lynch, supra,* p 679.

See also *Lemon, supra,* pp 612-613.

However, no single test or criterion is controlling. The Establishment Clause is not a precise, detailed provision capable of ready application. *Lynch, supra,* p 678. The clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship," rather than an absolute "wall." *Lemon, supra,* p 614.

### B

Most legislation or governmental action can survive the "secular purpose" test. The purpose need not be exclusively secular. Even where the benefits to religion appear substantial, there is no conflict with the Establishment Clause unless it is clear that the action was motivated wholly by religious considerations. *Lynch, supra,* pp 680, 681, and fn 6. See also *Mueller v Allen,* 463 US 388, 394-395; 103 S Ct 3062; 77 L Ed 2d 721 (1983).

Shared time instruction clearly is not intended to benefit one or all religions. See *Americans United for Separation of Church & State v Grand Rapids School Dist,* 546 F Supp 1071, 1085 (WD Mich, 1982), *aff'd* 718 F2d 1389 (CA 6, 1983), *cert gtd sub nom Grand Rapids School Dist v Ball,* 465

US 1064; 104 S Ct 1412; 79 L Ed 2d 739 (1984). Under § 1147, all nonpublic school students have an opportunity to enroll in shared time courses, even if their school is not religiously oriented. The purpose is clearly secular—to provide educational opportunities at public schools to all resident school-age children who are statutorily entitled to them and who are not currently receiving them.[15]

C

As to the "primary effect" test, two interrelated inquiries have developed. The challenged governmental action must have a primary secular effect. In addition, any non-secular effect must be remote,

---

[15] The fact that shared time may also incidentally defray the cost of educational expenses incurred by parents and enables nonpublic schools to continue or upgrade their present curriculum are also legitimate secular purposes. In upholding the constitutionality of a Minnesota statute providing tax deductions for public and private school expenses, the United States Supreme Court stated:

"A state's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a state's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring the state's citizenry is well-educated. Similarly, Minnesota, like other states, could conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and non-sectarian. By educating a substantial number of students, such schools relieve public schools of a correspondingly great burden—to the benefit of all taxpayers. In addition, private schools may serve as a benchmark for public schools, in a manner analogous to the 'TVA yardstick' for private power companies. As Justice Powell has remarked:

" 'Parochial schools, quite apart from their sectarian purpose, have provided an educational alternative for millions of young Americans; they often afford wholesome competition with our public schools; and in some States they relieve substantially the tax burden incident to the operation of public schools. The State has, moreover, a legitimate interest in facilitating education of the highest quality for all children within its boundaries, whatever school their parents have chosen for them. *Wolman v Walter,* 433 US 229, 226, *[sic]* 53 L Ed 2d 714, 97 S Ct 2593, 5 Ohio Ops 3d 197 [1977] (Powell, J., concurring in part, concurring in judgment in part, and dissenting in part).' " *Mueller, supra,* p 395.

incidental, and indirect. See *Nyquist, supra,* 413 US 783-784, fn 39; *Brandon v Guilderland Bd of Ed,* 635 F2d 971, 978 (CA 2, 1980), *cert den* 454 US 1123; 102 S Ct 970; 71 L Ed 2d 109 (1981); *Grand Rapids, supra,* 546 F Supp 1088; *Porter, supra,* 485 F Supp 436. The underlying question is whether a particular policy which is neutrally applied to religious organizations merely accommodates religious interests or impermissibly advances them. *Brandon, supra.*

The primary effect of shared time instruction is to provide secular public instruction to part-time nonpublic school students. *Citizens to Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App 168, 176; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976) (hereinafter *CAPE).* Shared time is merely one way to guarantee each child his or her statutory right to a public school education. This right extends to all nonpublic school children regardless of whether they are enrolled in a sectarian or secular nonpublic school. Ordinarily, benefits or assistance made available to a broad spectrum of citizens without regard to religious affiliation satisfy the "primary effect" test. See *Mueller, supra,* p 399; *Nyquist, supra,* p 782, fn 38; *Members of Jamestown School Committee v Schmidt,* 699 F2d 1, 9 (CA 1, 1983), *cert den* 464 US 851; 104 S Ct 162; 78 L Ed 2d 148 (1983); *Grand Rapids, supra,* 546 F Supp 1086.

The fact that shared time instruction allows nonpublic schools to forego offering certain courses, thereby allowing them to expend funds on other parts of their curriculum (including religious studies), does not mean that these schools are directly or immediately benefited. The United States Supreme Court has consistently rejected "the recurrent argument that all aid to [sectarian

institutions] is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends. *Committee for Public Education & Religious Liberty v Regan,* 444 US 646, 658; 100 S Ct 840; 63 L Ed 2d 94 (1980); *New York v Cathedral Academy,* 434 US 125, 134; 98 S Ct 340; 54 L Ed 2d 346 (1977); *Roemer v Maryland Public Works Bd,* 426 US 736, 747; 96 S Ct 2337; 49 L Ed 2d 179 (1976); *Hunt v McNair,* 413 US 734, 743; 93 S Ct 2868; 37 L Ed 2d 923 (1973). Even if defendant had demonstrated that shared time classes encourage attendance at nonpublic schools, this alone would not render shared time unconstitutional. See *Central Bd of Ed v Allen,* 392 US 236, 244; 88 S Ct 1923; 20 L Ed 2d 1060 (1968); *Everson, supra,* 330 US 17. "[Not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." *Lynch, supra,* p 683, quoting *Nyquist, supra,* 413 US 771.

An examination of United States Supreme Court decisions reveals that shared time instruction offered on public school premises is no more beneficial to or an endorsement of religion than other programs or services which have been upheld. These decisions reflect a clear distinction between programs that provide aid directly to nonpublic school students (the so-called "child benefit theory") and those that either in form or substance provide direct assistance to parochial schools themselves. *National Coalition for Public Education & Religious Liberty v Harris,* 489 F Supp 1248, 1258 (SD NY, 1980), *app dis* 449 US 808; 101 S Ct 55; 66 L Ed 2d 11 (1980).

In *Everson, supra,* pp 17-18, the Court upheld a program which paid the bus fares of all students attending public and nonpublic schools. The rationale was that the state was not contributing

money to the nonpublic schools, but was merely ensuring that children were transported safely to and from whatever school they attended.

The constitutionality of statutes authorizing textbook loans directly to both public and private school children has been repeatedly upheld on the grounds that the financial benefit inured to the parents and children, rather than the nonpublic schools. *Wolman v Walter,* 433 US 229, 238; 97 S Ct 2593; 53 L Ed 2d 714 (1977); *Meek v Pittenger,* 421 US 349, 362; 95 S Ct 1753; 44 L Ed 2d 217 (1975); *Allen, supra,* 392 US 244.[16]

Nonpublic schools may also be reimbursed for administering, grading, and reporting the results of standardized academic tests prepared and scored by the state. The rationale is that the state provides such tests to ensure that minimum educational standards are being met. In addition, the nonpublic schools are prevented from using these tests as part of their religious teaching because they cannot control the tests or their results. *Wolman, supra,* pp 240-241.[17]

A state, as part of its general health and welfare

---

[16] *Cf. Lemon, supra,* 403 US 617-623; *Meek, supra,* 421 US 363-366 (reimbursing religious schools directly for books, instructional materials, and portions of teachers' salaries related to teaching secular subjects held unconstitutional—the instructional materials and subsidies directly benefited the nonpublic schools, rather than the parents and children; moreover, monitoring the content of the teachers' instruction to ensure its secular content would engender excessive entanglement and political divisiveness over annual school appropriations). See also *Advisory Opinion re Constitutionality of 1974 PA 242,* 394 Mich 41, 49; 228 NW2d 772 (1975) (supplying textbooks and supplies to private schools violates Const 1963, art 8, § 2 as enacted by Proposal C).

[17] *Cf. Levitt v Committee for Public Education & Religious Liberty,* 413 US 472, 480-482; 93 S Ct 2814; 37 L Ed 2d 736 (1973) (reimbursement for teacher-prepared tests unconstitutional because there were no means available to ensure that the tests were free of religious instruction; reimbursement for state-prepared tests also held unconstitutional because it was not specifically restricted to the actual costs incurred in administering and correcting such tests).

program for all students, can provide school lunches, public health facilities, diagnostic speech and hearing services, police and fire protection, sewage facilities, streets and sidewalks, etc., for nonpublic schools and their students. Such services, facilities, and materials are secular, neutral, and nonideological in nature. *Id.,* p 242; *Meek, supra,* pp 364-365; *Lemon, supra,* 403 US 616-617. Thus, in *Wolman,* the Supreme Court upheld a program whereby speech and hearing diagnostic services were provided to nonpublic school students at nonpublic schools. Unlike teaching or counseling services, diagnostic services were found to have little or no educational content, were not closely associated with the educational mission of the nonpublic schools, and the diagnostician had only limited, objective contact with the students. *Wolman, supra,* p 244.[18]

Grants to church-sponsored colleges and universities were upheld in *Roemer, supra,* 426 US 758-759, *Hunt, supra,* 413 US 743-745, and *Tilton v Richardson,* 403 US 672, 679-682; 91 S Ct 2091; 29 L Ed 2d 790 (1971).[19] State tax deductions for educational expenses (such as tuition, textbooks, and transportation) incurred by parents of both public and nonpublic students were upheld in *Mueller* primarily because they were available to all parents. 463 US 397.[20] In *Zorach v*

[18] *Cf. Meek, supra,* pp 367, 371, and fn 21 (speech and hearing services which are diagnostic in nature can be offered at nonpublic schools, but auxiliary services cannot because of potential religious entanglement).

[19] Religiously affiliated colleges have consistently been characterized as not being pervasively sectarian, although parochial elementary and secondary schools are so characterized. *Harris, supra,* 489 F Supp 1258, fn 7. Thus in *Nyquist, supra,* 413 US 779-780, a "maintenance and repair" provision authorizing unrestricted grants to religious primary and secondary schools was struck down as having an impermissible primary effect of subsidizing and advancing the religious mission of these schools.

[20] See also *Walz v New York City Tax Comm, supra* (tax exemptions

*Clauson,* 343 US 306, 315; 72 S Ct 679; 96 L Ed 954 (1952), a "released time" program, whereby public school children were allowed to attend religious classes off campus during the school day, was found constitutional since it was designed to accommodate religion under the Free Exercise Clause.[21]

The Supreme Court has not directly addressed the constitutionality of shared time instruction taught at public schools.[22] In *Wolman, supra,* pp 247-248, the Court did address the propriety of offering certain therapeutic, guidance, and remedial services at public schools, public centers, and mobile units located off nonpublic school premises:

"We recognize that, unlike the [speech and hearing] diagnostician, the therapist may establish a relationship with the pupil in which there might be opportunities to transmit ideological views. In *Meek,* the Court acknowledged the danger that publicly employed personnel who provide services analogous to those at issue here might transmit religious instruction and advance religious beliefs in their activities. But, as discussed in Part V, *supra,* the Court emphasized that this danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school. 421 US, at 371. See also *Lemon,* 403 US, at 618-619. The danger existed there, not because the public employee was likely deliberately to subvert his

for churches and related buildings upheld). *Cf. Sloan v Lemon,* 413 US 825, 832; 93 S Ct 2982; 37 L Ed 2d 939 (1973); *Nyquist, supra,* pp 774-780 (tuition reimbursements and tax credits available only to parents of parochial school students constituted direct aid to parochial schools since they created an incentive to send children to such schools and were intended to preserve and support them.

[21] *Cf. McCollum, supra,* 333 US 209-210 (board of education's practice of employing religious teachers to give religious instruction to willing public school students at the public schools held unconstitutional).

[22] However, the Supreme Court has granted certiorari to determine the validity of shared time instruction at *nonpublic* schools in *Grand Rapids, supra.*

task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course. *So long as these types of services are offered at truly religiously neutral locations, the danger perceived in* Meek *does not arise.*

"The fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in *Meek.*[14] The influence on a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution. The dangers perceived in *Meek* arose from the nature of the institution, not from the nature of the pupils.

"*Accordingly, we hold that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion. Neither will there be any excessive entanglement arising from supervision of public employees to insure that they maintain a neutral stance. It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state.*

---

"[14] The purpose of the program is to aid schoolchildren, and the use of convenient local centers is a sensible way to implement the program. Although the public schools may often be used, considerations of safety, distance, and the adequacy of accommodations on occasion will justify the use of public centers or mobile units near the nonpublic school premises. [Appellant's Brief], at 42. *Certainly the Establishment Clause should not be seen as foreclosing a practical response to the logistical difficulties of extending needed and desired aid to all the children of the community.*" (Emphasis added.)

---

This reasoning is equally applicable to shared time instruction offered at public schools.[23]

[23] The incidental aid provided to nonpublic schools by shared time instruction similarly does not violate Const 1963, art 8, § 2. In *1974 PA 242, supra,* 394 Mich 47-49, this Court stated:

"In *Traverse City School Dist v Attorney General,* 384 Mich 390; 185 NW2d 9 (1971), this Court outlined the impact of Proposal C on various types of educational assistance programs. Proceeding from the premise that the voters in adopting Proposal C were simply intent on

D

The "excessive entanglement" test encompasses both administrative entanglement and potential political divisiveness along religious lines. See *Lynch, supra,* pp 683-684; *Regan, supra,* 444 US 653; *Meek, supra,* 421 US 372; *Lemon, supra,* 403 US 615, 620.[24] The trial court never made a specific finding that extensive coordination be-

outlawing parochiaid, the Court found it unnecessary to adopt 'a strict "no benefits, primary or incidental" rule.'[2] 384 Mich 390, 413. Instead, the Court favored a reasonable construction of the amendment's language. Under this construction the Court concluded that shared time programs—if properly controlled by the public school system—and auxiliary services such as health care and remedial reading programs could be provided to private schools consonant with the mandate of proposal C.

"In my opinion the Court reached correct conclusions in the *Traverse City School District* case because the services examined therein were properly classified as 'incidental' to a private school's establishment and existence. (See fn 2, *supra.*) Such programs as shared time and auxiliary services, to be sure, do help a private school compete in today's harsh economic climate; but, they are not 'primary' elements necessary for the school's survival as an educational institution. These incidental services are useful only to an otherwise viable school and are not the type of services that flout the intent of the electorate expressed through Proposal C.

"[2] The Court carried over to the non-support for private school provisions found in Proposal C the construction advanced in *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82; 180 NW2d 265 (1970), for distinguishing between permissible and impermissible state assistance to parochial schools. Since Proposal C speaks broadly in terms of the support and maintenance of all private schools, I think it is a proper interpretation of the *Traverse City School Dist v Attorney General* rule to state that Proposal C forbids aid that is a 'primary' element of the support and maintenance of a private school but permits aid that is only 'incidental' to the private school's support and maintenance. 384 Mich 390, 413."

[24] *Lemon,* p 615, set forth a three-point test to determine whether excessive entanglement exists:

"In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority."

tween public and nonpublic schools would be required to implement and maintain shared time programs. Contrary to the Court of Appeals majority's view, we believe that any administrative entanglement would be minimal. Under this decision, public school boards are allowed to determine independently the courses they wish to offer and the times and places where the courses will be taught (subject to the reasonable access requirement). Local boards may also impose reasonable rules and regulations concerning prerequisite courses, student conduct, discipline, attendance, grading, class size, etc., in order to manage and improve the school. Public school instructors will teach purely secular subjects to classes composed of both public and nonpublic school students. As noted in *Wolman, supra,* there is no need to supervise public school teachers to ensure the secular content of their instruction. Although occasional communications between public and nonpublic school officials concerning the administrative details involved in shared time instruction will be necessary, such contacts do not violate the Establishment Clause. *Jamestown School Committee, supra,* 699 F2d 12; *Harris, supra,* 489 F Supp 1269; *CAPE, supra,* 65 Mich App 179.

The Court of Appeals majority relied upon cases which involved constitutional challenges to shared time courses offered at *nonpublic* schools. Such programs were upheld in *CAPE* and *Traverse City,*[25] but struck down in *Grand Rapids, Porter,*

This test has been used on occasion (see, *e.g., Roemer, supra,* 426 US 748), but there are numerous Supreme Court decisions which have essentially ignored it. The test is sufficiently satisfied here. The majority of nonpublic schools are sectarian in nature. However, these schools are only incidentally benefited by shared time instruction. The relationship between the state and religious authorities is minimal and limited to administrative details.

[25] In addition, remedial education offered under the federal Title I

*Americans United for Separation of Church &
State v Paire,* 359 F Supp 505 (D NH, 1973), and
*Americans United for Separation of Church &
State v Oakey,* 339 F Supp 545 (D Ver, 1972). The
*Grand Rapids, Porter,* and *Paire* courts struck
down the shared time programs in part because
the classes were composed of only nonpublic school
students who were enrolled full time in the same
nonpublic school where the "shared time" courses
were being taught. The "public school" teachers
either formerly or presently taught in the non-
public schools. In some cases, there was substan-
tial evidence that the public and nonpublic school
authorities carefully coordinated their curricula to
prevent duplication of classes and accommodate
religious services. Most importantly, the courts
were particularly concerned that the teachers
would have to be regularly monitored to insure
the secular content of their instruction. Such prob-
lems do not exist where shared time programs are
offered in public schools and comply with rules set
forth in this decision.

As to political divisiveness along religious lines,
no such inquiry is required unless a direct subsidy
to religious schools or institutions is at issue.
*Lynch, supra,* p 684. Even if such an inquiry
were warranted, no divisiveness exists. Non-
public school students from both sectarian and
secular institutions have the opportunity to partic-
ipate in shared time instruction.[26] The present

programs at nonpublic schools has been upheld in *Harris* and *School
Dist of Hartington.* See also *Wheeler v Barrera,* 417 US 402, 426, 428;
94 S Ct 2274; 41 L Ed 2d 159 (1974), *modified* 422 US 1004; 95 S Ct
2625; 45 L Ed 2d 667 (1975).

[26] There is no evidence that there has been any divisiveness over
shared time instruction offered at public schools in the 60 years that
it has been conducted in this state. The controversy generated by
parochiaid and Proposal C revolved around the issue of direct subsi-
dies to parochial schools, rather than shared time itself. See *1974 PA
242, supra,* 394 Mich 47-48; *Traverse City, supra,* 384 Mich 410, fn 2.

litigation cannot be used as evidence of political divisiveness. Finally, even if some political divisiveness exists, this fact alone cannot serve to invalidate otherwise permissible conduct. *Id.*

Reversed.

WILLIAMS, C.J., and KAVANAGH and LEVIN, JJ., concurred with CAVANAGH, J.

BRICKLEY, J. *(dissenting).* The majority finds it unnecessary to answer the major constitutional questions posed by the parties in this case because of its conclusion that § 1147 of the School Code of 1976, MCL 380.1 *et seq.;* MSA 15.4001 *et seq.,* requires the defendant to allow plaintiff to select a band course offered by the defendant school district as a supplement to her educational program in a nonpublic school.[1] I do not agree with the majority's conclusion that its interpretation of the School Code is not "strained."

Having asserted that the "public schools are open to all residents of the school district who are at least five years old" the majority then posits that "[t]his statutory right . . . is not conditioned upon full-time attendance." Rather than set forth reasons for that interpretation of the statute in question, the majority then embarks on a line of reasoning that the school district could manage such a shared time program for students of nonpublic schools who wish to take part in the defendant's program on a selective basis.

While I find it a convincing argument that it would be possible and desirable to have such a shared time program, I consider that line of rea-

We disagree with the Sixth Circuit's contrary conclusion. See *Grand Rapids, supra,* 718 F2d 1408.

[1] This argument was raised by the plaintiffs for the first time before the Court of Appeals.

soning to be irrelevant to the question whether the Legislature in enacting § 1147 of the School Code intended to mandate such a program. The issue is not whether such a program is desirable, but whether it must be offered.

The majority states that the School Code of 1976 was intended as a recodification of existing law which contained "substantially similar language" and which had been interpreted as preventing the exclusion of "any resident because of race, color, or religious beliefs and to provide an equal right to all schools, irrespective of such distinctions."

Since that interpretation of the language of the original statute and later acts that specifically prohibited discrimination on the basis of race, color, or creed, the Constitution of 1963 elevated that protection from such discrimination. Const 1963, art 1, § 2; art 8, § 2.

It was, therefore, unnecessary to state such non-discriminatory language in § 1147, and that language was later dropped. Furthermore, the plaintiff does not allege that she has been denied admission to the band course because of race, color, or creed.

The majority, nevertheless, interprets the "shall have a right to attend school" language as having been violated by defendant's denial of plaintiff's request for selective admission even though there is no allegation that plaintiff has been treated differently from others seeking selective admission.

The question, then, is not whether the plaintiff can be denied admission as such, but whether the language of § 1147 was intended to allow a resident to select which parts of a school program he or she wishes to attend. I submit that § 1147 does not address that question.

If read literally, § 1147(1) would only extend "a right to attend school in the district," if it was "a

school district not maintaining a kindergarten";
and § 1147(2) would provide that in a district
having a kindergarten a resident is only "entitled
to enroll in kindergarten." If it was the purpose of
§ 1147 to guarantee a "right to attend school," it
certainly would not have conditioned such an im-
portant right only to a district not having a kin-
dergarten; and in a district having a kindergarten,
it would not have only ensured the right to enroll
in kindergarten.

Section 1147 read in its entirety is clearly in-
tended to deal with the beginning age of students
and to distinguish the starting age as between
districts that have or do not have kindergarten. An
attempt to make § 1147 the basis for mandating
shared time not only strains that section, but in
my view, tortures it.

Having posited a statutory right to attend school
on a selective basis, the majority then holds "not
every class offered by a public school must be
made available on a shared time basis," because
the compulsory attendance laws imply that the
nonpublic schools must provide a core curriculum.
The majority, unconvincingly I think, then pro-
vides that to allow the nonpublic students to leave
the private school for a core course would violate
the compulsory attendance laws.

Earlier in its reasoning, the majority said that
§ 1282 and § 1300 of the School Code allowing the
defendant school district "to determine public
school curriculum and operating policies" could
not "supersede a child's § 1147 right to attend
public school." Having given § 1147 a preferred
status over other statutes that give the defendant
control over the way it offers its courses, I fail to
see how the compulsory attendance law, even if it
were an obstacle to taking core courses in both
public and private schools, would not also be su-

perseded by the "child's § 1147 right to attend public school." Just because the nonpublic school must offer a core curriculum in order for its students to meet the compulsory attendance statute, it does not mean the student must take the core course at the nonpublic school. As the majority states, "[t]his statutory right to public education is not conditioned upon full-time attendance."

Finally, the majority recognizes the several statutes that require certain public school offerings such as special education, driver training, and auxiliary services to be made available to students attending nonpublic schools. If the majority's interpretation of § 1147 is correct, special legislative authorization for certain courses would have been unnecessary. The selective treatment of courses the Legislature intends to be offered to nonpublic school students on a mandatory basis is the best evidence that the Legislature did not, in § 1147 or any other statute, intend to mandate shared time beyond those subjects so designated.

Beginning with an argument that was not raised or argued before the trial court, the majority would first take a statute that on its face distinguishes between the beginning ages of students in kindergarten and non-kindergarten districts and convert it into a "right to attend school" statute. It would then declare the "right to attend school" equivalent to the right of a student who is receiving a "core curriculum" education at a private school to selectively attend " 'nonessential elective courses' " in the public school, and in passing interpret the compulsory attendance laws to prohibit shared time for core curriculum courses. The majority, thereby, not only mandates a shared time program for all of Michigan's public school districts, but, in doing so, presumes to dictate those courses which shall or shall not be man-

dated. I find no statutory justification for such judicial intervention in educational policy making. I would conclude as did the Court of Appeals that it has not been shown that the defendants violated the plaintiff's constitutional rights in not having a shared time program allowing her to participate in a band course on a selective basis.[2] I would affirm.

RYAN and BOYLE, JJ., concurred with BRICKLEY, J.

[2] My conclusion that plaintiff is entitled to no relief is based on the statute in question and should not be construed as an endorsement of the finding of the Court of Appeals majority that there is a "potential for excessive entanglement" under the Establishment Clause in the implementation of a shared time program that would accommodate the plaintiffs' requested relief.